Argued Dec. 16, 1970, affirmed February 11, petition for rehearing
denied April 8, petition for review denied June 15, 1971

FOLLMER ET AL, *Appellants, v.* COUNTY OF
LANE ET AL, *Respondents-Cross-Appellants.*

480 P2d 722
486 P2d 1312

186

*Winfrid K. F. Liepe,* Eugene, argued the cause for appellants. With him on the briefs were Stanley R. Darling, and Johnson, Johnson & Harrang, Eugene.

*John L. Luvaas,* Eugene, argued the cause for respondents-cross-appellants. With him on the brief were Luvaas, Cobb, Richards & Fraser, Ralph T. Aldave, Husband, Johnson & Frye, and Richard Smurthwaite, Eugene.

Before Schwab, Chief Judge, and Langtry, Branchfield* and Holman, Judges.

LANGTRY, J.

Plaintiffs are residential property owners resisting a reclassification of defendants Chase and

---

* Branchfield, J., did not participate in this decision.

Whiteakers' agricultural land to commercial zone. They sought and failed to get a declaratory judgment invalidating the reclassification in the circuit court, and appeal from that judgment. The complicated facts were extensively produced and contested in several hearings before the Lane County Board of Commissioners, who legislated the zone change, and in the trial court. We have read 44 pounds of pleadings, briefs, transcripts and exhibits (excluding 15 pounds of maps), and from them relate the essential facts for our decision.

Defendants Chase and Whiteaker owned tracts of adjoining land (Chase much the larger tract) which were included in the original 1949 comprehensive zoning ordinance for Lane County as agricultural land and continued as such in the revised comprehensive plan adopted in 1959, apparently sometimes referred to as "The 1960 Comprehensive Plan." The land was immediately north of the Willamette River, which flows westerly in the area. The boundaries of the city of Eugene extend to the south bank of the river. The city, which let the county know it opposed the zone change, has annexed much other property north of the river, and it is probable that sometime it will annex the subject property. Much of the property to the north is zoned single family residential, with the exception of property immediately across Country Club Road, which bounds subject property on the north, and which is generally zoned for professional offices and apartments. However, immediately across this road to the northeast is the Eugene Country Club parking lot, restaurant and part of the golf course. Several acres of nonconforming use land, consisting of a large logging truck storage and repair yard, also lie immediately across the road to the north.

As the area north, east, and west of the subject property developed, and its population spectacularly increased (most of it after the original comprehensive zoning), better access became necessary. During the late 1960's Interstate 105 freeway was built along the north side of the river, joining new Delta freeway a short distance downstream from subject property at a point where a new bridge (Jefferson Street) was constructed and opened in 1968. Before Interstate 105 was constructed, a substantial part of the acreage belonging to the owners of the subject property was condemned for the project. This cut their property off from the river, which had provided irrigation water. A publicly-owned green strip about 4500 feet long and averaging less than 200 feet wide, most of it formerly defendants' land, was left along the river. The remaining property belonging to the Chases and Whiteakers is a solid area consisting of 22 acres about 2500 feet long and 500 feet wide, tapering at each end, except that the westerly end abuts a separately-owned and partially-improved 500 feet, zoned multiple family residential district.

The subject property is bounded by freeway I 105 to the south, and to the north by Country Club Road, which is planned to become a four-lane arterial street, and by freeway, and highway and bridge interchanges at the tapered ends easterly and westerly. The property beyond, easterly and westerly, is devoted exclusively to extensive commercial enterprises. These commercial areas are about 6000 feet apart. The shortest distance between them is composed of 2500 feet of the subject property, 500 feet of multiple family residential property, and about 3000 feet of freeways and highway interchanges. The Ferry Street Bridge is about 1000 feet from the east end of subject prop-

erty and the Jefferson Street Bridge is about 1750 feet from the west end. The last condemnation taking from the subject property was 1.15 acres for access to another proposed highway and bridge, "Route F."

The Lane County Planning Commission attempted to change the comprehensive plan for this whole area on April 11, 1967, and included was a change to commercial zone for the subject property. The trial court held this action was invalid because of failure to give public notice as required by ORS 215.060. Defendants cross-appeal this decision.

Defendant Kendall Ford, which lost its quarters in Eugene by fire, is a regional agency for Ford Motor Company. It has a contract to buy the subject property and proposes to build thereon a large vehicle sales agency and service complex. It filed an application to change the zone to commercial on January 13, 1967. The application was rejected by the Board of County Commissioners on May 17, 1967, by a 2-to-1 vote, after the Planning Commission had favorably acted upon the application. A second application was filed November 12, 1968, for commercial use zone (C-3X), as to lots constituting 17 acres, and for a residential-professional zone (RP-X) as to lots constituting five acres. After another favorable recommendation from the Planning Commission, the Board allowed this application in Ordinance No. 308 by a 2-to-1 vote. The latter action is the principal subject of this appeal.

Plaintiffs' principal contentions are (1) that the latter application, initially filed with and approved by the Planning Commission, was not accompanied by an affidavit alleging "material and different circumstances" from the first application, as required by

Lane County Zoning Ordinance No. 4; (2) that the Board did not give legal notice required by ORS 215.223 (1) of its meetings to consider the application, and (3) that the action of the Board which followed the approval of the Planning Commission was arbitrary and illegal.

The closest any of the plaintiffs' property is to the subject property is about one-fourth of a mile. None of the adjacent property owners opposed the zone change, and most of them informed the commissioners they favored the change. The basis for joining the litigation for two of the plaintiffs, husband and wife, is that they live on property they own, situated well over a mile from the subject property. This plaintiff husband works for a person who is actually paying the costs of the litigation for all of the plaintiffs. He owns property located on another side of the city of Eugene which is zoned for, and which he would apparently like to sell for, the same purpose Kendall Ford proposed for the subject property.

■ The trial court concluded that Kendall Ford's second application, filed November 12, 1968, was substantially different from the first one filed January 13, 1967, and, therefore, no affidavit was required. Section XXIII of Ordinance No. 4 provides that after an application for reclassification has been denied, more than six months must elapse before a new application "for such a reclassification" can be made, and then it must be accompanied by an affidavit "setting forth material and different circumstances existing which did not exist" before. The first application was to reclassify all 22 acres from agricultural use to commercial C-3 use, with no controls except those applicable to the C-3 commercial zone, generally. Any of many enumerated businesses would have been al-

lowed under such a reclassification, and the entire land surface area could have been improved. The second application was to reclassify 17 acres to C-3X use, with architectural control, and five acres to PR-X, professional-residential use with architectural control. The *second application* was substantially different from the first, because, under the C-3X and PR-X zones, pursuant to Section XX of Ordinance No. 4, limitations on the surface area improved were required, and the architectural control limited the type and use of the buildings. Therefore, it was unnecessary to file an affidavit about a change in circumstances. Section XXIII of Ordinance No. 4 contemplates an affidavit accompanying a second application which is for the *same reclassification* sought in the first.

■ Plaintiffs contend that the Board did not give the notice of its meeting at which Ordinance No. 308 was adopted, as required by ORS 215.223 (1).

ORS 215.223 provides:

"(1) No zoning ordinance * * * may have legal effect unless prior to its enactment the * * * [county board] or the planning commission conducts one or more public hearings * * * and unless 10 days' advance public notice of each hearing is published * * *.

"(2) The notice provisions of this section shall not restrict the giving of notice by other means, including mail, radio and television.

"* * * * *."

The Lane County Home Rule Charter requires that all proposed ordinances must be read in regular meeting of the Board on two different days at least 13 days apart. The regular meeting date is on Wed-

nesday of each week. Ordinance No. 308 was first read on January 8, 1969, a regular meeting date, at which time there was a public hearing on it. The Ordinance was read again and heard on January 23, 1969, and adopted. The commissioners later realized that the requisite notice under ORS 215.223 (1) had not been given, and that the second meeting was not on a regular meeting date. The first complaint in this proceeding was filed February 21, 1969. On March 22, 1969, a notice was published for a second reading of Ordinance No. 308 and public hearing on April 2, 1969. This reading and hearing was held, and at the regular meeting on April 9, 1969, Ordinance No. 308 was adopted. Plaintiffs, in essence, contend that after the mistakes about notice and regular meeting dates occurred in January, the only procedure for validly adopting the ordinance was to start over. They say that if the Board chooses to have more than one hearing the statute requires that a public notice must be published for each—once one is missed, it is irretrievable. The trial court held that the meeting and hearing on January 8, 1969, was not a hearing on the merits requiring public notice, but that it was a first reading; that the meeting of January 23 was a nullity; that the reading and hearing of April 2, 1969, conformed to all requirements of notice; and that the action of April 9, 1969, was valid.

At the April 2, 1969, hearing, every phase of the proposed reclassification was open for discussion pro and con. The hearing lasted for the major part of a day and at least fifteen people were heard. Toward the end of the hearing, when more people did not rise to speak, Chairman Elliott said, "Who's next? Any other people who would like to speak in opposition?" None responded and he allowed the at-

torney for the proponents a few minutes in rebuttal. Two more opponents were then heard in surrebuttal and the meeting ended. We agree with the trial court that the hearing of April 2, 1969, conformed with all requirements of notice and the other formalities made mandatory by ORS ch 215. The procedural requirements precedent to valid action at the April 9, 1969, regular meeting were met.

The trial court held that the action of the Planning Commission, which preceded the Board's adoption of Ordinance No. 308 was not dependent upon a prior change in the comprehensive plan. The plaintiffs contend this is error.

ORS 215.110 (3) provides that the board may enact, amend or repeal zoning ordinances to carry out part or all of the comprehensive plan. It may initiate action in this regard, but if it does, it must, if it has a planning commission, request a report and recommendation from that body. Under ORS 215.060, action of the planning commission regarding "the plan" shall have no legal effect unless the commission first conducts a hearing on "the plan and unless" notice is published. This obviously refers to a hearing on the comprehensive plan, not a reclassification of individual properties such as is here involved.

The notice requirements for zone changes such as those involved here are found in ORS 215.223. We have held above that the requirements of subsections (1) and (2) of this statute were met. Subsection (3) provides that when the board is "effecting" a zone change, the proceedings for which are requested by a property owner, it shall, in addition to other notice, give adjoining property owners special notice. That was done in this case.

It is true that the property owners seeking the reclassification filed their request with the Planning Commission rather than directly with the Board, but that was not required in ORS ch 215, although it was permissible thereunder. That procedure was required by the county's comprehensive zoning plan contained in Ordinance No. 4. The procedural requirements of both ch 215 and Ordinance No. 4 were met with reference to Ordinance No. 308. In view of this conclusion, there is no need to consider here the cross-appeal relating to validity of the comprehensive plan proceedings in 1967.

■ Plaintiffs contend that the Board's action in passing Ordinance No. 308 was arbitrary and illegal, and that the Board had the burden of proving that the alleged spot zoning was reasonable. Defendants contend that this was not spot zoning, that there was substantial evidence to support the reclassification, and that the court may not, inasmuch as the record proves its contention, substitute its judgment for the legislative judgment. Consistent with this contention, none of the defendants put on an affirmative case in the trial court. Counsel have cited many spot zoning cases and the recent article, Platt, *Valid Spot Zoning: A Creative Tool for Flexibility of Land Use*, 48 Or L Rev 245 (1969).

> " 'Spot zoning' is the practice whereby a single lot or area is granted privileges which are not granted or extended to other land in the vicinity in the same use district * * *." 1 Rathkopf, The Law of Zoning and Planning 26-1 (3d ed 1966). See also 46 Or L Rev 323 (1967).

■ We do not think this was spot zoning, or that it is necessary for us to compare the area of this reclassified tract of land with the area of tracts that

have been held to have been illegally spot zoned. The evidence before the Board, which was introduced in the plaintiffs' case in the trial court, indicated that a reasonable basis existed for the Board's decision. That evidence indicated that the tract is located in close proximity to other less restrictive use zones; namely, the extensive commercial districts which have developed easterly and westerly from it; it is significantly affected by increased traffic; is located on newly existing transportation facilities; and single-family residential development in close proximity to it has virtually stopped during the time the other changes have occurred.

In coming to our conclusion we have looked to see if the record made by the Board discloses an evidentiary basis for the action taken. See note: *Roseta v. County of Washington*, 6 Will L J 605 (December 1970). In marked contrast to the lack of evidence and lack of a record noted in *Roseta v. County of Washington*, 254 Or 161, 166, 458 P2d 405 (1969), extensive minutes of hearings were kept in the case at bar, and verbatim notes were made and transcribed by a court reporter of the meetings of April 2 and 9, 1969. They disclose substantial evidence to support the Board's findings. The members of the Board related the reasons for their votes.[1]

---

[1]
"MR. OMLID: First of all, my consideration of the testimony * * * in the past hearing, and the evidence in the exhibits presented, and firsthand facts in this matter have led me to the following conclusions * * *.

"* * * [T]he general area * * * is relatively unpopulated and under-developed.

"* * * * *

"In 1959 a comprehensive plan was approved which designated the planned use for this parcel to be residential-pro-

fessional, and since that time hardly any such development has occurred in this area.

"I might point out that this is the extent of the residential-professional [pointing on map]. I lived in this house for about seven years up until about 1965, so I am well acquainted with the area personally.

"This area was started earlier, and as the highway system came through there, it seemed to slow down.

"In the same period of time other substantial changes have developed in the area, which to me has inhibited the growth * * *.

"* * * [T]hese changes are the construction of the network of high volume roads which you see, and they would include the Belt Line which feeds into this, the Delta Highway, Centennial coming up to the east, the Washington-Jefferson Street Bridge, and the Interstate 105.

"* * * [T]he traffic generated through this system of highways has been very high, and the increase will be greater * * *.

"* * * [T]hey do create quite a noise problem, and it makes it quite unsuitable for residential uses.

"Since the comp plan * * * [w]e have the Valley River Shopping Center at one end, the one area which is the development of the Belzhiser Complex in there, which is professional buildings.

"Down at this end we have the A&W Root Beer, Volkswagen, and if we go on further around into the Centennial and Coburg [road] area, we have quite a complex of commercial development, the Sizzler Steak House, the shopping center, Oakway Mall, * * * as we go farther up Coburg Road.

"Then down Centennial we get into Autzen Stadium, The Elks Club, and those facilities in that direction. This area presently is not served by a public sewer system, although it is surrounded by residential properties, and sewers are going in.

"* * * [I]t will be at least five years before public sewers come into this area, and this would not be too suitable for residential development on that basis, whereas the present proposed use can easily be accommodated by a 2500 gallon septic tank system.

"* * * * *

"It is my opinion that the public welfare would best be served rezoning * * * the land in question from AGT to C-3X in accordance with the updated plan adopted by the Planning Commission in 1967.

"Some of the advantages of this action are these: It is a relatively large parcel of ground which would be developed as a unit under the supervision of our Planning Department.

"Under the Architectural Controls provided the area would be developed for use as an auto dealership designed to fit into the surroundings and appropriately landscaped.

"An opportunity would be provided for the employment of the latest in the development concepts in auto dealer facilities, thus hastening the end to traditional strip-type of auto lot development.

"Little, if any, suitable property is available for this purpose at the present time. In my opinion this change of zone will not be incompatible with the surrounding uses.

"* * * The existing development consists of the Eugene Country Club with its large parking lot in this area, a few houses, and this huge area of logging truck operation parking, and so forth, and few homes over in this area, and then our complex that started some time ago on professional buildings.

"The parcel under consideration has good barriers setting it off from other land in the area. I might mention this a little bit. On this side, of course, we have the Freeway, and then the river which separates it from the Eugene area and the Skinner's Butte Park area.

"On this side we have a natural barrier in the roadway and with the possibility of starting a buffer here with RP-type operation, and on into residential against the golf course.

"Then we have the slough in this area and the abrupt rising ground plus the complete golf course on this side which makes the entire area fairly well buffered on any encroachment in any direction. So this is the extent of my remarks.

"MR. ELLIOTT: Fine. Mr. Hill, do you have any comments?

"MR. HILL: No, not necessarily. I can't agree with Ken on the last of his. For instance, the development to the east of there, the A&W Root Beer, is well buffered from this area by Interstate 105 there. Also the area to the north of this road, as Ken mentioned a couple of times, is undeveloped, and you can't say that a road like that is a barrier to the development across the road there.

"I can see no reason if this is zoned on this side why it would not zone on the other side. There are various things of this kind that could enter in, but these have all been pointed out in the various hearings that we have had, so I have no further remarks on it.

"MR. ELLIOTT: All right. Well, I would have to concur in the major part with Mr. Omlid's findings and statement, and in regard to the road as a buffer, the road in itself is not the buffer, but, as Mr. Omlid has stated, this lends very handily to phasing out and conducting or forming a buffer strip between the commercial going down into RP and maybe a multiple residential on into the residential area.

"Many public officials, including myself, have spent many years in developing this traffic mover or these traffic movers who have actually changed the nature of this particular area, including the 105, the Delta, the Jefferson Street Bridge. We have all worked very closely with that with a long-range plan in mind of serving the over-all community including Eugene, moving traffic in and around the particular area, also moving traffic through from Springfield on this particular 105 on through to Route F, and to the Coast, so all of these things, as Mr. Omlid has said, have changed the nature of this particular area.

"* * * [W]e must look at it . . . at Eugene and Lane County as a growing body, and it is growing very rapidly, and I think any of us who have raised children know that if you leave a jacket or a shirt on a growing boy too long with the collar buttoned, he is going to choke himself to death, so I think in the over-all planning for the systematic and progressive growth of Lane County evidence is pretty well presented that this area has changed by nature, and as a result we must look for growth.

"So is there any other discussion? Any other comment?

"MR. HILL: The question?"

Board Chairman Elliott was called as a witness at the trial, and further explained his reasons, partly in testimony under the rule, and partly not under the rule. Included in the latter was the following:

"Q (By Mr. Darling) Can you think of any items [leading to favorable consideration of Ordinance No. 308] that were not in the record made by the Court Reporter at your April 2nd, 1969 meeting?

"A One that I might mention goes back where we had considered at the suggestion of some people that this might be a park area, we asked for research by our Parks Advisory Committee and by our Parks Staff; they made exhaustive studies and came back and said that because of 105 cutting it off from the natural attraction that would make it a park, in other words, the river, that this particular piece of property was no longer useful as a park ground or park area.

We consider that it was unnecessary to receive much of the evidence that was received in the trial court[2]—indeed, a large part of the evidence in the voluminous record was taken under the rule of equity which allows it, although objection had been sustained. The court correctly sustained the objections.

Affirmed.

### ON PETITION FOR REHEARING

Winfrid K. Liepe, and Johnson, Johnson & Harrang, Eugene, for the petition.

No appearance contra.

Before Schwab, Chief Judge, and Langtry and Fort, Judges.

LANGTRY, J.

In a petition for rehearing, plaintiffs have challenged in several respects the fact statement upon which our opinion is based.

"Q  Now, is that the only other evidence that you recall that you used, other than the record made by the stenographer at the public meeting on April 2, 1969?

"A  I can't think of any other particular one at this moment."

[2] See 2 Rathkopf, The Law of Zoning and Planning, 65-30, 65-33, 65-34 (3d ed 1966); Linde, *Public Law—1960 Oregon Survey,* 40 Or L Rev 249, 265 (1961); 2 Yokely, Zoning Law and Practice 414, Judicial Construction § 19-2 (3d ed 1965); 8A McQuillan, Municipal Corporations 265, Zoning § 25.278 (3d ed 1965); Archdiocese of Port. v. Co. of Wash., 254 Or 77, 458 P2d 682 (1969).

One of these challenges is correct in a substantial aspect. We said that the reclassification application of January 13, 1967, included the entire 22 acres and requested a C-3 zone for it. With reference to the second application, we said it requested C-3X zone, with architectural control, for 17 acres and PR-X zone, with architectural control, for 5 acres. We were correct as to the acreages, but the zones requested in the application were C-3 and PR. The "X" "with architectural controls" for each request was added later. This correction in our fact statement lessens the difference between the first and second application, but there was a substantial difference between them, and we hold that the trial judge was right in holding that a change-of-circumstances affidavit was an unnecessary adjunct of the second filing.

The petition for rehearing is denied.